UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
LISA ESPOSITO,

                Plaintiff,

-against-

HOFSTRA UNIVERSITY, ALAN J. SINGER,
and STUART RABINOWITZ,

                Defendants.
-----------------------------------------------------------------X

Case No.: 11-CV-2364
(LDW) (ETB)

**AMENDED COMPLAINT**

*Jury Trial Demanded*

    Plaintiff LISA ESPOSITO, by and through her attorneys, The Law Office of Steven A. Morelli, P.C., alleges, upon knowledge as to herself and her own actions, and upon information and belief as to all other matters, as follows:

### PRELIMINARY STATEMENT

1. This action is brought pursuant to Title IX of the Education Amendments of 1972, The Age Discrimination Act of 1975, The New York State Human Rights Law, and contains any other cause of action which can reasonably be inferred from the facts set forth herein, to redress violations of the Plaintiff's rights as guaranteed by the laws of the United States and the State of New York prohibiting unlawful discrimination and retaliation in an educational institution.

### JURISDICTION

2. This Court has original jurisdiction over the Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 & 1343, and supplemental jurisdiction over the Plaintiff's state claims pursuant to 28 U.S.C. § 1367.

3. Venue is proper pursuant to 28 U.S.C. § 1391.

1

4. All conditions precedent to filing suit, if any, have been fulfilled.

## PARTIES

5. Plaintiff LISA ESPOSITO, a 49 year old female, at all relevant times, was and still is a resident and domiciliary of the County of Nassau in the State of New York. Esposito resides at 2625 Orr Street, Merrick, NY 11566.

6. Defendant HOFSTRA UNIVERSITY, at all relevant times, was and still is a private university in Hempstead, New York, and upon information and belief, receives federal financial assistance.

7. Defendant STUART RABINOWITZ, at all relevant times, was and still is the President of Hofstra University. The Office of the President is located at 144 Hofstra University, Hempstead, NY 11549-1440.

8. Defendant, ALAN J. SINGER (hereinafter "Professor Singer"), at all relevant times, was and still is a Professor of Secondary Education and was Plaintiff's Professor.

## FACTUAL BACKGROUND

9. Esposito was accepted and enrolled in the Masters in Education program (MES) at Hofstra University for the spring 2010 semester.

10. In October of 2009, prior to her acceptance into the program, Esposito met with Professor Singer for an interview to get into the MES program. Professor Singer went over Esposito's undergraduate grades and expressed his concern because her grades for her undergraduate history classes were "only" B plusses. Esposito defended her grades and explained to Professor Singer that she received those grades over twenty years ago.

2

11. Professor Singer told Esposito that if she could maintain a certain grade point average (G.P.A.) during the winter semester he would accept her into the graduate program. Esposito did in fact maintain the required G.P.A. and was accepted into the MES Graduate Program.

12. Esposito took the SED 292 class with Professor Singer during the winter semester beginning in January 2010.

13. During the winter 2010 semester Esposito attended all of Professor Singer's classes. The class began on Tuesday, January 5, 2010, and was scheduled to meet on Tuesday and Thursdays for the winter session.

14. About a week or two into the semester, Esposito had an assignment graded and returned to her. Esposito was not happy with her grade, so Professor Singer invited her into his office to discuss the paper.

15. While in Professor Singer's office, Esposito sat in a chair at his desk that was for guests. Rather then sitting at his desk chair, Professor Singer sat in the chair immediately next to her.

16. Esposito attempted to discuss her paper with Professor Singer, but he made sexual advances at her by asking her to go out for a drink to discuss the paper. Esposito refused his advances and his invitation to go out for a drink.

17. After Esposito refused Professor Singer's sexual advances, he would constantly pick on her during class. As an older student, Esposito had strong political views that differed from Professor Singer's views, so he would viciously argue with her during class and single her out for any opinion or comment she made during the class discussion.

18. Also during the winter semester, the class was told that they could waive their right to an A if they signed a waiver. By signing a waiver the students would receive a B for their work and did not have to write a ten-page paper. However, it was never told to Esposito that if the ten-page paper was not good enough to earn an A then the grades on four other papers would be negated no matter what the grades were.

19. In addition to completing all of her other assignments, Esposito decided to write the ten-page paper in an effort to earn an A.

20. One of the approved books Esposito used in writing her paper was called "Cows, Pigs, Wars and Witches" by Marvin Harris. The book described how societies used Messiah to control the people and that one of those Messiahs was Jesus Christ. Esposito was scolded by Professor Singer for expressing what she felt about the topic in her paper.

21. Esposito thought that she was allowed to freely express her views because Professor Singer consistently expressed his views. For example, he told the class that he was an Atheist, he was liberal, and in an email he expressed that he "almost became a terrorist" at one point in his life.

22. The paper was cut up and critiqued many times by Professor Singer. Even though Esposito did many revisions in the time she had, when the deadline came she handed it in. Esposito was never told that she could have received an extension to continue working on the paper. If she was told about the possibility of getting an extension she would have had until August to work on the paper.

23. Only after Esposito received the graded paper, which was given a D by Professor Singer, was she told that she could have asked for more time to work on it.

24. Due to Esposito receiving a D on the final paper, she was given a C for her semester grade. All of the grades from her previous papers were negated.

25. Professor Singer told Esposito that she should not appeal her grade of a C because he would fight it and informed her that she was being put on academic probation. Esposito did not appeal this grade because she wanted to go into SED 294, which Professor Singer was also teaching, without any problems. However it did bother Esposito to see other younger students receive A's who did not earn them.

26. For example, Esposito witnessed Professor Singer critique another younger student's paper and tell the student to re-do the paper. However, that student handed in the same paper without any revisions and received an A.

27. In addition to his harsh critiques of Esposito's work and ill-will towards her, Professor Singer would punish Esposito by not handing back her papers and not accepting assignments when she tried to hand them in on the date they were due.

28. Esposito felt that Professor Singer's argumentative and aggressive behavior towards her was a result of her turning down his sexual advances. Also, he disagreed with her opinions and would make it a point to attack every comment she made.

29. Every assignment or paper Esposito handed in was harshly critiqued by Professor Singer; however, despite the harshness of his critiques, Esposito would make the appropriate revisions and accept the critique as part of the learning process. Esposito even went to the writing lab to work on Professor Singer's critiques.

30. In the spring 2010 semester Esposito was enrolled in the SED 294 class also taught by Professor Singer.

31. As for Esposito's work in SED 294, she handed in all of her work on time. She was asked to revise two pieces of work during the semester, which she did voluntarily. Esposito did her best to deal with Professor Singer's harsh criticism of her work and his negative treatment of her, but she noticed more and more that she was being treated differently than her classmates.

32. For example, Esposito had to do an activity sheet assignment five times because of a misunderstanding regarding the instructions located on the syllabus. Another student did the same assignment on the wrong topic and asked Professor Singer if it should be revised, but that student was told by Singer not to worry about it. Even though Esposito's assignment was completed on the correct topic it was still added to Professor Singer's long list of grievances regarding her performance.

33. Another assignment was on a Unit Lesson Plan, where the students were separated into groups by Professor Singer. Esposito joined a group that chose the topic of the Roaring Twenties and the New Deal.

34. The group met at Esposito's home on March 6, 2010, for four hours to discuss the topics each of them would use and to write a rationale for the unit. Three members of the group were present. One group member did not show up. That student did not attend any meetings and just handed in work with the group, and upon information and belief earned a B+ grade for his work. Professor Singer did not say anything to that student for not attending the group meetings.

6

35. Upon completion of each group member's lesson plan, they emailed it to the head of the unit for approval. There were many emails sent between the unit members concerning this project.

36. There was a second group meeting for revisions, but Esposito could not attend because she and her son had a fever. She called the unit manager to say she would be there in a half hour, but he assured her that she did not need to attend and that her revisions were good and ready for the due date that Tuesday.

37. Professor Singer returned the project back the next week and went around to each group separately, handed the unit project to the unit manager and told each group member their grade for their individual lesson plans.

38. Professor Singer left Esposito until last and asked her to sit alone at a desk adjacent to the group. Professor Singer told Esposito, in a harsh tone loud enough for other students to hear, that she got an F on the project. He also told her that because she did not attend the final group meeting and did not produce the corrected material, she was not included in the final group unit grade.

39. Professor Singer's public critique of Esposito was embarrassing and demeaning, but she did not want to rebut or argue her position in front of her classmates.

40. At the end of the class, Esposito spoke in private with Professor Singer's teaching assistant regarding how she could revise her work and amend her grade. Esposito also approached Professor Singer and told him that she would be happy to revise her work and submit it the following week. He responded by saying that he probably would not accept it and that he may not revise his decision to keep her

7

out of the unit grade, despite it saying on the syllabus that a student is allowed to revise work that is "Not to Standard."

41. The following week Esposito handed in the revised lesson plans. She made every effort to achieve a better grade including using all required materials and following all directions given to her by the teaching assistant.

42. After the final exam, Esposito saw that Professor Singer was holding her revised lesson plan. They spoke for a moment, but Esposito forgot to ask him for the revised copy and he did not hand it back to her. Professor Singer never returned the revised lesson plan to Esposito.

43. The next evening, Professor Singer emailed Esposito a formal letter with an explanation of her grade. The letter stated that she failed to hand in a particular assignment, which was incorrect. Regarding that assignment, Esposito told Professor Singer that her internet was not working and that she would email him the assignment as soon as the Cablevision repairman fixed the problem, which she did on March 3, 2010. Esposito even provided a Cablevision receipt to Professor Singer to prove that she had internet repairs.

44. Also during the spring 2010 semester, Esposito was taking SED 242 taught by Adjunct Professor Michael Pezone, who happened to be very good friends with Professor Singer.

45. Esposito did not have any previous problems with Pezone, but that semester she received a 78 on the final and a C for the semester.

46. This grade did not seem fair to Esposito because another student in the class got an A- for the semester grade, even though he only got an 80 on the final and handed the paper in late.

47. Also, without providing a legitimate reason, Professor Pezone told Esposito that he did not feel she was qualified to be in the program or to teach history.

**Appeal of Grades and Complaint of Sexual Harassment**

48. By letter dated May 20, 2010, Esposito, through her attorney, reached out to Hofstra University President, Stuart Rabinowitz (hereinafter "President Rabinowitz"). The letter informed President Rabinowitz that Esposito had retained counsel because she felt she was discriminated against based on her age in SED 294, taught by Professor Singer, and SED 242, taught by Dr. Michael Pezone. The letter also expressed Esposito's concern with the fairness of the appeal process because her appeals were being heard by people directly involved, including Professor Singer.

49. The independent party on appeal was supposed to be Assistant Dean Donna Levinson, but because she was out on medical leave, Dr. Maureen Murphy took her place. Dr. Murphy wrote a book with Professor Singer and has a close personal relationship with him, which made her anything but an independent party in a case involving Professor Singer.

50. In June, Esposito appealed the grade she received from Professor Singer in SED 294 and from Professor Pezone in SED 242.

51. By letter dated July 15, 2010, Karin J. Spencer, Ph.D. Associate Dean informed Esposito that she considered her grade appeals for SED 242 and SED 294 but

9

determined that she could not ask Professor Singer or Professor Pezone to reconsider the grades. The letter also informed Esposito that she has the right to appeal the matter on the next level pursuant to the SOEHHS grade appeal policy.

52. By letter dated July 16, 2010, Professor Singer informed Esposito that as of that date she was dismissed from the program. The letter also set forth the appeal process and the alleged reasons for Esposito's dismissal.

53. Thereafter, during the summer of 2010, while Esposito was scheduled to take summer courses, she appealed her grade three more times.

54. Additionally, in or about July 2010, Esposito filed a sexual harassment complaint with the school against Professor Singer.

55. The University asked Esposito for a list of witnesses or people to interview regarding her complaint. She gave the school the names of two classmates, Maria Korobkova and Gerald Konce, as witnesses to the sexual harassment. The University only interviewed Ms. Korobkova during the investigation but never attempted to contact Mr. Konce.

56. After the University conducted the "investigation" into Esposito's complaint of sexual harassment, the Equal Rights and Opportunity Officer determined that Professor Singer did not violate the University's Harassment Policy.

57. Esposito appealed the decision and subsequently received a letter from Herman A. Berliner, Ph.D., Provost and Senior Vice President for Academic Affairs, dated December 6, 2010, stating that he reviewed the appeal of the Equal Rights and Opportunity Officer's decision and affirmed the finding that there is no

reasonable cause to believe Professor Singer has violated the University's Harassment Policy.

58. After her last appeal, Esposito went before the Ad Hoc Committee, which is a committee comprised of people from the University, but not in the department. The Ad Hoc Committee denied Esposito enrollment in the school and she was sent a letter of dismissal from the program.

59. Subsequently, Esposito was permitted to take two classes during the fall 2010 semester, but the University required her to retake SED 294. Initially Esposito refused to retake the course because Professor Singer was the only person who taught it; however, the school informed her that they hired another professor, Dr. Sordelline, to teach the course

60. Esposito was told that, according to policy, she needed to get an A- in the course in order to student teach the following semester. This was a policy that Esposito had never heard of before.

61. Esposito received a B+ from Dr. Sordelline in the fall 2010 SED 294 class; however, she felt that again she was being graded harsher than others and should have received an A-.

62. There were some assignments that Esposito had done for Professor Singer's class that she redid for Dr. Sordelline's class. Esposito had past students from Professor Singer's class look over her assignments before handing them in and they all said she did a good job, but when Esposito received the grade back she found that she was being graded more harshly than other students. It also

appeared that her work was looked over twice because it was marked with blue and black pen.

63. Esposito asked Dr. Sordelline questions concerning her grade but would always get a vague response such as. "I wasn't sure what you wanted to say."

64. Dr. Sordelline also told Esposito that she would put in a good word for her with Professor Singer. Esposito went to speak with Dean Levinson concerning this statement because she was assured at the beginning of the course that she would be graded subjectively and not be judged by the fact that she was repeating the course or what occurred with Professor Singer.

65. Esposito asked if Dr. Sordelline knew that she was repeating the course and Dean Levinson responded by saying that Dr. Sordelline could have looked at her transcript to find this information out.

66. Esposito felt as though she was not treated fairly while retaking this class, and although she deserved an A- for the work she did, which was in line with most of her other grades, she received a B+ which would better support the school's position during Esposito's appeals process.

67. In addition, Esposito was taking SED 205 during the fall 2010 semester. This was a course she was supposed to take in August 2010 before she was dismissed.

68. Because Esposito was put on probation pending the outcome of her grades during the fall 2010 semester, she was unable to enroll in classes for the next semester at the same time as other students.

69. Beginning in the spring 2011 semester, Esposito was placed in a student teaching assignment at East Meadow High School. Esposito was skeptical of her

placement with her particular cooperating teacher, Kristen Campbell, because she heard that other students had difficulties with that teacher the previous semester.

70. Since the first day of student teaching Ms. Campbell was unwelcoming to Esposito and was very harsh to her both inside and outside the classroom. During the course of her student teaching, Ms. Campbell would even yell at Esposito in front of the students.

71. On February 24, 2011, Esposito was called into a meeting at Dean Levinson's office. Also in the meeting were Esposito's supervisor Barbara Bernard and Dean Spenser from the Ad Hoc Committee. Esposito was told that the purpose of the meeting was for an early evaluation, which is not typically done for student teachers.

72. In the meeting, the Deans and Esposito's supervisor began bringing up complaints made by Ms. Campbell. All of the complaints had been addressed and corrected between Ms. Campbell and Esposito at the school and there was no reason for them to be addressed at this point, except to further attack Esposito and find a reason to discipline her.

73. While in the meeting Esposito expressed that she was not happy with her placement, but the Deans and her supervisor told her to continue on with the student teaching assignment, even though it is in the student handbook that if a student is unhappy with a placement they should be removed and placed somewhere else. Esposito decided to follow their instructions and put her best effort towards finishing the student teaching assignment.

74. On February 28, 2011, which was the first day back at school after the winter break, Esposito returned to East Meadow High School. After her first two classes of the day she was called into the principal's office where she was told that she was being dismissed from her student teaching assignment at East Meadow High School.

75. After her dismissal, Ms. Campbell told Esposito that it was probably good because she was failing her anyway. This was outrageous because Esposito had completed all of her required lesson plans and she had been putting her best efforts towards her student teaching.

76. The same day Esposito went to meet with the Dean at Hofstra. There she was told that she had three options; (1) complete three more rotations of student teaching, (2) extend the student teaching period at another school, or (3) take two independent courses to earn a Masters in Curriculum instead of the Masters in Education, which is the degree that she has paid for and has been working towards over the last year. Esposito was told that she had only one day to make this very important decision.

77. Esposito ultimately felt compelled to choose to earn a Masters in Curriculum because Hofstra informed her that there might not be an available rotation to satisfy Esposito's student teaching requirement, and Esposito feared that if she encountered similar problems at a new student teaching placement, that she would risk losing the opportunity to earn a Masters degree altogether.

78. All of the events that took place in the last month show the Defendants' continued pattern and practice of retaliation against Esposito. Her supervisors at Hofstra

advised Esposito to continue her student teaching in an environment where they knew she was unhappy, only to have her be dismissed the next school day. Now, after investing so much time and money towards earning her Masters in Education the Defendants are once again attempting to force Esposito out of this program.

79. The Defendants have persistently retaliated against Esposito since her complaint of age discrimination and sexual harassment in 2010 and have continuously attempted to find any reason to push her out the program, despite her being a dedicated and hard-working student.

**Retaliation After Filing the Complaint on May 16, 2011**

80. After filing the Complaint in this action on May 16, 2011, Defendants further retaliated against Esposito.

81. More specifically, on May 24, 2011, Esposito received a letter from Cheryl Betz, Assistant for Community Standards for the University, that the Provost's office would be reviewing a charge of academic dishonesty in her SED 300A class.

82. In that regard, Esposito met with Professor Elena Jurasaite-Harbison, the instructor for her SED 300A class on several occasions to discuss her final research paper, which is the subject of the accusations of academic dishonesty.

83. During these meetings, both in person and via electronic mail, Professor Jursaite-Harbison indicated to Esposito that she believed her paper needed more citations and quotations.

84. Esposito acknowledged that she needed to make such changes to her paper before handing it in for a final grade.

85. In keeping with past practice, Esposito emailed Professor Jurasaite-Harbison a draft of her paper for her review and comment.

86. Professor Jurasaite-Harbison thereafter directed Esposito to upload her draft paper to Blackboard, a website used by faculty and students at Hofstra that enables instruction and submission of papers and exams over the web. Jurasaite-Harbison explained to Esposito that she needed the draft paper uploaded to Blackboard in order to provide Esposito with feedback on the paper in "track changes," a tool used in Microsoft Word to mark a document with redline and add comments.

87. Esposito then uploaded her draft paper as per Jurasite-Harbison's direction, but believed that it was clear to Jurasite-Harbison that this was not her final paper, and that Esposito was uploading the paper only to get feedback from Jurasite-Harbison.

88. Despite having added additional citations and ensuring that she had credited other sources, Jurasite-Harbison still contended that Esposito's paper violated Hoftra's academic honesty policies.

89. Rather than inform Esposito that she needed to make additional improvements on her draft paper (as was the customary practice), Jurasite-Harbison instead graded the draft paper as if it were the final submission, and reduced Esposito's grade from a B- to a C-.

90. Jurasite-Harbison also posted Esposito's paper on www.turnitin.com. "Turnitin" hosts a website where papers are uploaded to check for originality of a paper and, upon information and belief, papers can be viewed by the public.

91. Esposito did not give Defendants permission to post her paper to this website.

92. Moreover, on May 26, 2011, Esposito learned that she had also been accused of plagiarism in her SED251 course, taught by Professor Barbara Bernard.

93. Similarly to her practices with Jurasite-Harbison, Esposito met with Bernard to discuss her final assignment on several occasions.

94. During one of their meetings prior to turning in her final assignment, Bernard informed Esposito that she needed to add more citations in order to avoid plagiarizing other authors.

95. Esposito agreed and revised her work with appropriate citations.

96. However, Bernard still penalized Esposito by reducing her grade from a B to a B-.

97. Despite Esposito's revision of the work to include proper citations, and despite having penalized Esposito by lowering her grade, Bernard still reported to the University's Provost that Esposito had violated policies of academic honesty.

98. Esposito learned that Bernard had reported her alleged violation of academic honesty on May 26, 2011, just four days after she had attended the graduation ceremony where she believed that she had attained her degree after receiving passing grades in all of her courses.

99. As a result of the aforementioned retaliation by Defendants, Esposito is now in jeopardy of losing credit for these courses, and not receiving her degree.

100. Esposito must now appeal the charges against her, a lengthy and difficult process, and has she no assurance that she will receive her degree from Hofstra.

101. Based upon the foregoing, Plaintiff has been subjected to further retaliation since the filing of her Complaint on May 16, 2011.

## CLAIMS FOR RELIEF

102.    By reason of the foregoing, Defendants have unlawfully discriminated against Plaintiff based upon her gender, age, and opposition to discriminatory practices, in that she was subjected to adverse actions, a hostile environment, and an ongoing atmosphere of adverse acts which went unabated in violation of Title IX of the Education Amendments of 1972, The Age Discrimination Act of 1975, and The New York State Human Rights Law.

**WHEREFORE,** the Plaintiff demands judgment against the Defendants for all compensatory, emotional, psychological and punitive damages, injunctive relief, liquidated damages, reinstatement, and any other damages permitted by law pursuant to the above-referenced causes of action. It is respectfully requested that the Court grant the Plaintiff any other relief to which the Plaintiff is entitled, including but not limited to:

1. Awarding reasonable attorneys fees, costs and disbursements of this action;
2. Issuing a permanent injunction enjoining the Defendants from further abridging the Plaintiff's rights, including but not limited to, an injunction preventing Defendants or any of their agents or employees from providing negative, misleading, or disparaging references pertaining to Plaintiff and/or her academic standing; and,
3. Granting such other and further relief that to the Court seems just and proper.

**Further**, Plaintiff requests a trial by jury.

Dated: Garden City, New York  
June 17, 2011

The Law Office of Steven A. Morelli, P.C.  
*Attorneys for the Plaintiff*  
1461 Franklin Avenue  
Garden City, New York 11530  
(516) 393-9151

By: _____  
STEVEN A. MORELLI (SM 4721)

19